**[Cite as *Scala v. Scala*, 2025-Ohio-4550.]**

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

CHRISTOPHER A. SCALA,

    Appellant

    v.

WILLIAM A. SCALA, et al.

    Appellees

C.A. No.    2024CA0093-M

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF MEDINA, OHIO
CASE No.    20 CIV 0505

DECISION AND JOURNAL ENTRY

Dated: September 30, 2025

---

SUTTON, Judge

{¶1} Plaintiff-Appellant Christopher A. Scala, individually, as trustee of the Christopher A. Scala Trust, and derivatively on behalf of Kenmore Construction Co., Inc. ("Chris") appeals the judgment of the Medina County Court of Common Pleas granting the motion for summary judgment of Defendants-Appellees William A. Scala ("Bill") and Samuel P. Scala, Executor of the Estate of Michael Scala ("the Estate.")  For the reasons that follow, this Court affirms.

I.

**Relevant Background Information**

{¶2} This appeal is the second appeal from the trial court in this action.  In 2023, this Court sustained, in part, Chris's fourth assignment of error in *Scala v. Scala*, 2023-Ohio-2232, ¶ 74 (9th Dist.) ("*Scala I*"), and remanded the matter to the trial court for further proceedings consistent with the decision.  Much of the relevant factual and procedural background of this case was set forth in *Scala I* and we reiterate relevant portions of that background in this decision.

{¶3}    The action in the trial court was a refiled action that began in 2017 when Chris filed a complaint against two of his brothers, Bill and Michael Scala.  Michael passed away in 2018, and Samuel P. Scala, as the executor of the Estate, was listed as a Defendant in the refiled action. Much of the dispute centered on a 1990 Agreement Restricting Disposition of Shares of Kenmore Construction Co., Inc. ("Shareholders' Agreement") and its subsequent amendments.  This appeal concerns specifically the Second and Third Amendments to the Shareholders' Agreement. Kenmore Construction Co., Inc. ("Kenmore") was founded in 1956 by the father of the Scala siblings.  The five siblings, Bill, Chris, Michael, Paul Scala, and Margaret Scala inherited the business from their father upon his passing in 1985, and were equal shareholders. The Shareholders' Agreement was signed by all five siblings.

{¶4}    While the five siblings were equal shareholders, Bill was president, chief executive officer, and chairman of the board and was responsible for much of the daily operations of Kenmore. Bill and Chris did not see eye to eye on many matters with respect to the management of Kenmore. In fact, Chris had a difficult relationship with all of his siblings. Nonetheless, Kenmore prospered financially under Bill's leadership. Its primary business is the construction of heavy highway systems, although it has additional lines of business.

{¶5}    However, in 1992, when Bill returned from a vacation, Chris, Paul, and Michael voted to oust Bill as president. Bill accepted the vote but was asked to come back within hours when the other siblings discovered the bonding company would not bond Kenmore if Bill was not president. Bill agreed to come back if Paul and Margaret gave Bill their voting rights for five years.

{¶6}    Kenmore's legal counsel recommended the Shareholders' Agreement be amended to provide for proxies and voting trusts in light of the voting rights Bill sought. Chris and Michael sought separate counsel to see if there was a way to prevent this First Amendment to the

Shareholders' Agreement from passing. The attorney informed Michael and Chris that shareholders holding 60 percent of the shares could pass an amendment. On May 4, 1992, the shareholders met. Michael ultimately decided to join Bill, Paul, and Margaret in voting to adopt the First Amendment. Chris voted against the adoption of the First Amendment.

{¶7}    The dynamics of the shareholders changed further when, effective December 31, 2010, Kenmore redeemed both Paul's and Margaret's shares, leaving Chris, Bill, and Michael as equal 1/3 shareholders in Kenmore.

{¶8}    In 2014 or 2015, Michael indicated he wanted to rid himself of his shares due to health concerns. However, under the Shareholders' Agreement as amended at the time, due to the fact that the shares had to first be offered to Kenmore and then the remaining shareholders pro rata, Bill and Chris would end up as equal shareholders, a situation Michael wanted to avoid. In fact, neither Bill nor Michael wanted to be a 50 percent shareholder with Chris. Bill then sought legal representation. A Second Amendment was then proposed and voted on in January 2016. Chris voted against the amendment, but it was adopted via a 2-1 vote, with Bill and Michael voting in favor of the amendment. The Second Amendment to the Shareholders' Agreement provided if Kenmore declined to redeem the shares, the selling shareholder could then offer the shares to any remaining shareholder or shareholders in a proportion of the selling shareholder's choosing.

{¶9}    In November 2016, a Third Amendment to the Shareholders' Agreement was adopted following a 2-1 vote in favor. Chris again voted against the amendment, while Bill and Michael voted in favor of it. The Third Amendment replaced the provision amended by the Second Amendment. The new provision added that a selling shareholder could offer the selling shareholder's shares to one or more lineal descendants under conditions specified in the provision. In addition, at that time, Michael offered his shares to Kenmore. Chris moved Kenmore to accept

the offer, but the motion was not seconded. Instead, Bill and Michael moved to decline the offer. Thus, Kenmore did not redeem Michael's shares.

{¶10} In December 2016, Michael sold his shares to Bill. Thus, Bill owned 2/3 of the shares and Chris continued to own 1/3.

{¶11} Chris's original lawsuit was filed in June 2017. It was dismissed and then refiled July 14, 2020, raising fifteen causes of action. Bill and the Estate counterclaimed. Cross-motions for summary judgment were filed and the trial court granted summary judgment in favor of Bill and the Estate, including on Chris's second cause of action in his complaint, which alleged Bill and Michael, as the majority shareholders of Kenmore, breached their heightened fiduciary duties owed to Chris by amending the Shareholders' Agreement so Bill could acquire all of Michael's stock without providing Chris any opportunity to acquire an equal portion of the stock. Chris appealed, and this Court sustained, in part, Chris's fourth assignment of error concerning Chris's second cause of action, breach of fiduciary duty by the majority shareholders. This Court reasoned the provision in the Shareholders' Agreement that Chris agreed to be bound by was a provision explaining the *procedure* to amend the Shareholders' Agreement. The provision did not deal with the *substance* of the amendment itself. We stated:

> Essentially, under the trial court's reasoning, irrespective of the substance of the amendment, Chris could not succeed on a claim of a breach of fiduciary duty as long as the procedure was followed. If this were the law, majority shareholders could easily circumvent their fiduciary duties by enacting amendments to accomplish what would otherwise be impermissible. We cannot say that Chris's contractual agreement to the procedure upon which the Shareholders' Agreement could be amended also meant that Chris was agreeing to the substance of any amendment so long as it was adopted according to the proper procedure. A provision can be adopted pursuant to the terms of an agreement and nonetheless violate a fiduciary duty.

*Scala I* at ¶ 35.

{¶12}   We also determined the trial court erred when it relied upon the business judgment rule in finding in favor of Bill and the Estate because Chris asserted Bill and Michael violated their fiduciary duties as *majority shareholders,* not as directors, and the business judgment rule applies to disinterested directors.  *Id.* at ¶ 36, citing *Maas v. Maas,*2020-Ohio-5160, ¶ 20-21 (1st Dist.).

{¶13}   After the decision in *Scala I*, Bill and the Estate applied for reconsideration of this Court's decision, asking this Court to apply *Crosby v. Beam*, 47 Ohio St.3d 105 (1989) to the facts of this case.  *Crosby* sets forth the fiduciary duty owed by majority shareholders to minority shareholders in close corporations.  This Court declined to reconsider its decision, stating it would be more appropriate for the trial court to apply the appropriate standard in the first instance.  Chris sought to appeal this Court's decision to the Supreme Court of Ohio, which declined jurisdiction. *Scala v. Scala,* 2024-Ohio-2160.

{¶14}   Upon remand to the trial court, Bill and the Estate filed a renewed motion for summary judgment on Chris's second cause of action.

{¶15}   The trial court granted the renewed motion for summary judgment, stating, "[t]hat [Michael] ultimately decided to sell all of his shares to Bill does not mean that Chris was deprived of the same opportunity to solicit them under the [a]mendment as Bill," and "[a]s such because the [a]mendments treated all shareholders equally, it cannot serve as the basis for a breach of majority shareholder fiduciary claim."  The trial court further stated, "[t]he amendments adopted by Bill and [Michael] were undertaken for a legitimate business purpose-to prevent a 50/50 deadlock that could threaten the long-term viability of Kenmore."

{¶16}   Chris has appealed, raising three assignments of error for our review.

II.

### ASSIGNMENT OF ERROR I

**THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR DEFENDANTS WILLIAM SCALA [] AND SAMUEL P. SCALA AS THE EXECUTOR OF THE ESTATE OF MICHAEL SCALA[.]**

{¶17} In his first assignment of error, Chris argues the trial court erred in granting summary judgment in favor of Bill and the Estate on his second cause of action, which alleged breach of fiduciary duty to a minority shareholder in a close corporation by the majority shareholders.

{¶18} This Court reviews an award of summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). Summary judgment is appropriate under Civ.R. 56 when: (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party. *Temple v. Wean United, Inc.,* 50 Ohio St.2d 317, 327 (1977), citing Civ.R. 56(C). A court must view the facts in the light most favorable to the non-moving party and must resolve any doubt in favor of the non-moving party. *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 358-359 (1992). The party moving for summary judgment bears the initial burden of informing the trial court of the basis for the motion and pointing to parts of the record that show the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293 (1996). Specifically, the moving party must support the motion by pointing to some evidence in the record of the type listed in Civ.R. 56(C). *Id*. Once a moving party satisfies its burden of supporting its motion for summary judgment with acceptable evidence pursuant to Civ.R. 56(C), Civ.R. 56(E) provides that the non-moving party may not rest upon the mere allegations or denials of the moving

party's pleadings. *Id.* at 293. Rather, the non-moving party has a reciprocal burden of responding by setting forth specific facts, demonstrating that a "genuine triable issue" exists to be litigated at trial. *State ex rel. Zimmerman v. Tompkins*, 75 Ohio St.3d 447, 449 (1996).

### *Crosby v. Beam*

{¶19} *Crosby*, 47 Ohio St.3d 105, states at paragraph two of the syllabus: "[w]here majority or controlling shareholders in a close corporation breach their heightened fiduciary duty to minority shareholders by utilizing their majority control of the corporation to their own advantage, *without providing minority shareholders with an equal opportunity to benefit*, such breach, *absent any legitimate business purpose*, is actionable." (Emphasis added.)

{¶20} In a close corporation, the majority shareholders owe a heightened fiduciary duty to deal in the utmost good faith and loyalty with the minority shareholders. The fiduciary duty between majority shareholders and minority shareholders is breached when the majority shareholders control the corporation in such a way as to prevent the minority shareholders from having an equal opportunity in the corporation absent a legitimate business purpose. *Palmer v. Bowers,* 2019-Ohio-1274, ¶ 18 (9th Dist.), citing *Crosby,* 47 Ohio St.3d at 108-109. There is no dispute here that Kenmore is a close corporation. *Scala I* at ¶ 33.

{¶21} Chris argues the Second and Third Amendments to the Shareholders' Agreement deprived him of having an equal opportunity in the corporation, the amendments served no legitimate business purpose, even if preventing deadlock is a legitimate business purpose, a means less harmful to Chris's interests than allowing Bill to acquire all of Michael's shares was required, and the justification of "legitimate business purpose" is not available to Bill because of his personal interest in acquiring Michael's shares.

{¶22} Bill and the Estate argue: (1) Chris had an equal opportunity to benefit from the Second and Third Amendments to the Shareholders' Agreement; and (2) there was a legitimate business purpose in preventing Chris and Bill from being 50/50 shareholders in Kenmore because such a split may well have led to a voting deadlock and possible dissolution of the company. Bill and the Estate further argue *Crosby supra* does not require the majority or controlling shareholders to utilize less harmful means to prevent deadlock, and in a close corporation, all shareholders have a personal interest to some extent in the outcome of shareholder votes and such personal interest is actually taken into account by the *Crosby* standard.

**Equal Opportunity**

{¶23} The Second Amendment to the Shareholders' Agreement was adopted by a 2-1 vote, with Michael and Bill voting in favor and Chris voting against the amendment. The Second Amendment provided if a shareholder wanted to rid himself of his shares, he would have to offer the shares to Kenmore and if Kenmore declined to redeem the shares, the shareholder could offer his shares to any remaining shareholder or shareholders in a proportion of the seller's own choosing. The Third Amendment added that a selling shareholder could offer his shares to one or more lineal descendants. In accordance with the amendments, Michael offered his shares to Kenmore, but Chris's motion for Kenmore to accept the offer was not seconded, and Bill and Michael moved for Kenmore to decline the offer. After Kenmore did not redeem the shares, Michael sold all of his shares to Bill, making Bill the majority shareholder owning 2/3 of the shares and leaving Chris owning 1/3.

{¶24} Bill and the Estate argue the Second and Third Amendments applied equally to Chris, Bill, and Michael. Further, Bill and the Estate argue Chris's second cause of action alleges

only the acts of amending the Shareholder's Agreement were the breaches of Bill's and Michael's fiduciary duty, not Michael's transfer of stock to Bill pursuant to those amendments.

{¶25} Chris's second cause of action as set forth in his complaint alleges in part that Bill and Michael "as the majority shareholders of [Kenmore], breached their heightened fiduciary duties owed to [Chris] by amending the Shareholders' Agreement so that [Bill] could acquire all of Michael's . . . stock without providing [Chris] any opportunity to acquire an equal portion of the stock[.]" The alleged motivation for the amendments is so Bill could acquire all of Michael's stock without providing Chris any opportunity to acquire an equal portion of the stock.

{¶26} The first prong of the *Crosby* standard, as applied to Chris's second cause of action, is whether Bill's and Michaels's vote to amend the Shareholders' Agreement to allow non-pro rata transfers of shares prevented Chris from having an equal opportunity in the corporation. At the time the amendments were voted on, Chris, Bill, and Michael were equal shareholders. After passage, the amendments applied equally to all the shareholders, including Chris. The fact that one of the shareholders elected to sell all of his shares to another shareholder, however, does not mean Chris did not have an equal opportunity under the amendments to purchase all or some of the shares or to sell his shares to another shareholder or lineal descendant in a proportion of his choosing. The outcome of the transfer of shares from Michael to Bill resulted in Chris and Bill having an unequal amount of shares, but the amendments did apply equally to Chris, Bill, and Michael, and provided all three shareholders with the same opportunity to buy or sell shares according to the terms of the amendments.

{¶27} Therefore, there is no genuine issue of material fact that the Second and Third Amendments to the Shareholders' Agreement applied equally to Chris, Bill, and Michael.

{¶28} However, we recognize that abuse or oppression by majority or controlling shareholders can include a "'squeeze-out' or 'freeze-out' meaning the 'manipulative use of corporate control to eliminate minority shareholders, or to reduce their share of voting power or percentage of ownership assets, or otherwise deprive them of advantages or opportunities to which they are entitled.'" *Maas*, 2020-Ohio-5160, at ¶ 70, quoting *Vontz v. Miller,* 2016-Ohio-8477, ¶ 31 (1st Dist.), quoting *Estate of Schoer v. Stamco Supply, Inc.*, 19 Ohio App.3d 34, 38 (1st Dist. 1984).

{¶29} There is no question Bill and Michael voted in favor of the Second and Third Amendments in order to reduce Chris's voting power, as admittedly, they wanted to prevent a 50/50 split or deadlock between Bill and Chris. Chris was outvoted on the passage of the Second and Third Amendments, but that does not necessarily mean he was oppressed. "When a person acquires shares in a corporation, he comes in to be ruled by the majority in interest, and as long as such majority acts within the scope of the powers conferred by the corporation, the voice of the majority is the voice of the corporation and all of the shareholders." *Maas* at ¶ 88, quoting *Koos v. Cent. Ohio Cellular, Inc.,* 94 Ohio App.3d 579, 588 (8th Dist. 1994). The fiduciary duty owed by majority or controlling shareholders in a close corporation "*do[es] not mean* that minority shareholders can frustrate the will of the majority simply by disagreeing over the course of corporate action." *Id.* That is, provided the majority or controlling shareholders had a "legitimate business purpose" for the corporate action, as we will discuss below.

{¶30} While we have decided there is no genuine issue of material fact that the Second and Third Amendments to the Shareholders' Agreement applied equally to Chris, Bill, and Michael in theory, we recognize Bill and Michael acted so Chris would not have an equal vote in the

corporation going forward. Therefore, in the interest of thoroughness, we will now address the second prong of *Crosby*: legitimate business purpose.

**Legitimate Business Purpose**

{¶31} According to the record, Chris has often been at odds with the other shareholders, including Bill, and unanimous agreement inside the family business was very difficult to obtain. Chris agreed Kenmore has done extremely well under Bill's leadership and he has no quarrel with the financial performance of Kenmore. Bill's leadership included putting Kenmore's profits back into the company, being conservative in distributing the profits to shareholders, and not borrowing money for capital improvements and asset acquisition in order to maintain the long-term financial health of the company and preserve it for future generations. As this Court noted in *Scala I,* Chris's disagreements with Bill led to Bill's ouster as president of Kenmore in 1992, an action that impaired the company's ability to get bonded. *Scala I* at ¶ 5. Chris was described by family members as being a "contrarian" and having "views . . . contrary to Kenmore's culture," and because of this, Chris's termination as an employee had been suggested. But Bill did not support the termination of Chris's employment because Bill did not believe their father "would have wanted any sibling's ouster." Nevertheless, the record shows the relationship between Bill and Chris led to great concern by his siblings, who were the shareholders and former shareholders of Kenmore, about the fate of the company should Chris and Bill become 50/50 shareholders.

{¶32} By enacting the Second and Third Amendments to the Shareholders' Agreement, Bill and Michael sought to prevent a potential 50/50 deadlock between Bill and Chris, which they believed could cause harm to the company and possibly lead to dissolution of the company. While Chris averred in an October 3, 2024 affidavit he "never threatened to deadlock Kenmore at any time[,]" the record is replete with evidence Chris and Bill did not agree on business matters and

12

there was no trust between them. Chris's and Bill's siblings Margaret and Paul, who are former Kenmore shareholders, both stated they would never want to be 50/50 partners with Chris because Chris appeared to place his personal interests ahead of the company and its employees and had little interest in generational succession. And this Court observes that Chris has never been in a position to cause a deadlock, because until Michael sold his shares to Bill, Kenmore has always had an odd number of equal shareholders, first five, then three.

{¶33} Chris submitted the affidavit and report of Douglas K. Moll, a law professor whose research has focused on closely-held businesses and oppressive majority conduct. Mr. Moll did not believe Kenmore would be harmed by a deadlock between shareholders because a deadlock would not affect the day-to-day operations of Kenmore as Bill would continue to run the company because Kenmore's corporate code of regulations stated the officers of Kenmore shall hold office until their successors are chosen and a deadlock between shareholders would not result in Bill's removal. But, the record reflects that a deadlock could result in dissolution or sale of the company, a concern expressed by current and former shareholders, and Chris himself admitted it would not be in Kenmore's best interests for two 50 percent shareholders to exist without a clear mechanism for breaking deadlocks. At his deposition, Chris admitted, "[w]ithout a - - without a mechanism could be a problem." Preventing one shareholder from thwarting the other to the detriment of the corporate enterprise has been found to be a "legitimate business purpose" where, as here, the relationship between shareholders is characterized by hostility. *See Horizon House-Microwave v. Bazzy*, 21 Mass.App.Ct. 190, 200 (1985).

{¶34} Chris acknowledged a corporate deadlock would be a problem, but argues Bill and Michael were obligated to utilize a means to avoid possible deadlock that was less harmful to Chris's interests, such as an irrevocable voting proxy or Bill becoming a 50.1 percent shareholder

instead of a 66 2/3 percent shareholder. We decline to expand *Crosby* in this way. First, "it is not for the courts to second-guess the choices the majority shareholders make[.]" *Koos,* 94 Ohio App.3d at 592. The *Crosby* standard set forth in 47 Ohio St.3d 105, paragraph two of the syllabus, states in order to be actionable, the majority or controlling shareholders' actions must be *without any legitimate business purpose*. This is currently the law in Ohio as set forth by the Supreme Court of Ohio and *Crosby* does not require utilization of a less harmful means. We cannot say the Second and Third Amendments to the Shareholders' Agreement did not serve *any* legitimate business purpose, specifically the stated purpose of avoiding deadlock, even where other options to avoid deadlock may have been available. Second, Chris admitted he never approached Bill with any resolution, other than Chris be a 50 percent shareholder.

{¶35} Finally, Chris also argues Bill had a personal interest in becoming 66 2/3 percent owner and is not entitled to argue that the actions of himself and the Estate had a "legitimate business purpose."

{¶36} However, in a close corporation, nearly every vote or decision by a shareholder will likely impact that shareholder's personal interests, many times to the shareholder's advantage. Indeed, the *Crosby* rule applies where majority or controlling shareholders utilize their majority control to their own advantage. *Crosby,* paragraph two of the syllabus. The protection for minority shareholders is that an action by the majority or controlling shareholders to their own advantage from which minority shareholders do not equally benefit is required to be for a legitimate business purpose. Those circumstances are what trigger the heightened scrutiny set forth in *Crosby*. Further, if Chris's motion that Kenmore purchase Michael's shares had passed, Chris's percentage of shares would have increased from 33 1/3 percent to 50 percent, which would have benefitted him personally, and he admitted "every decision you make when you're involved in a close

corporation has some level of personal interest involved because you're the owner of the company."

**{¶37}** Based on the evidence filed in support of and opposed to the motion for summary judgment, there is no genuine issue of material fact that the passage of the Second and Third Amendments to the Shareholders' Agreement had a legitimate business purpose; to prevent deadlock between corporate shareholders.

**{¶38}** We must also address a position taken by the dissent. The dissent states the trial court "failed to follow this Court's remand instructions in our prior decision." We disagree. In *Scala I*, we reasoned that despite Chris's agreement to the procedures for amending the Shareholders' Agreement, an amendment adopted pursuant to that procedure could still violate a fiduciary duty owed to Chris. *Id.* at ¶ 35. We then determined the trial court erroneously relied on the business-judgment rule in granting summary judgment in favor of Bill and the Estate. *Id.* at ¶ 36-37. On remand, the trial court applied the "legitimate business purpose" standard set forth in *Crosby* to the facts of the case when granting the renewed motion for summary judgment. Again, the *Crosby* standard is, "[w]here majority or controlling shareholders in a close corporation breach their heightened fiduciary duty to minority shareholders by utilizing their majority control of the corporation to their own advantage, without providing minority shareholders with an equal opportunity to benefit, such breach, absent *any* legitimate business purpose, is actionable." (Emphasis added.) *Id.* at paragraph two of the syllabus. Therefore, the only issue to be decided by the trial court was whether there was a genuine issue of material fact concerning whether preventing corporate gridlock was a legitimate business purpose.

**{¶39}** Further, when Bill and the Estate asked this Court to apply *Crosby* to the facts of the case in their application for reconsideration of *Scala I*, this Court specifically stated, "[a]s this

Court is a reviewing Court, we conclude it is more appropriate for the trial court to *apply the appropriate standard* in the first instance." (Emphasis added.) On remand, the trial court did so.

{¶40} Therefore, Chris's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

**THE TRIAL COURT ERRED IN ADOPTING, VIRTUALLY VERBATIM, [BILL AND THE ESTATE'S] PROPOSED "JOURNAL ENTRY" GRANTING THEIR "RENEWED" [MOTION FOR SUMMARY JUDGMENT].**

{¶41} In his second assignment of error, Chris argues the trial court erred in adopting the proposed journal entry granting summary judgment submitted by Bill and the Estate. No rule prohibits trial courts from adopting a party's proposed order or journal entry. *See State v. Riley*, 2024-Ohio-5712, ¶ 15. In fact, the local rules of many trial courts, including the Medina County Court of Common Pleas, allow and, for some motions, require the submission of proposed orders or journal entries. "A trial court may adopt as its own a party's proposed [order] if it has thoroughly read the document to ensure that it is completely accurate in fact and law." *Mentor v. CSX Transp., Inc.,* 2005-Ohio-3386, ¶ 41 (11th Dist.), quoting *Adkins v. Adkins*, 43 Ohio App.3d 95 (4th Dist. 1988), paragraph three of the syllabus. The trial court's adoption of a party's proposed decision is not in error unless the facts or law set forth therein are erroneous. *See New Haven Corner Carry Out, Inc. v. Clay Distrib. Co.,* 2002-Ohio-2726, ¶ 26 (3d Dist.).

{¶42} Because we have determined after a de novo review that the trial court did not err in granting summary judgment in favor of Bill and the Estate, the trial court did not err in utilizing the language in their proposed journal entry.

{¶43} The dissent has criticized the trial court for ordering Bill and the Estate to submit a proposed judgment entry before "it heard from the other side." However, the local rules of the

Medina County Court of Common Pleas actually require the movant to submit a proposed journal entry granting the motion with the motion. Medina County Local Rule 5(G) states:

> Proposed Journal Entries *The movant shall prepare a proposed journal entry granting the motion and submit it to the Court along with the motion.* Failure to submit a proposed journal entry may result in delay in ruling or denial of the motion.

(Emphasis added.) We cannot fault the trial court for complying with its own rules. As for the dissent's expressed concern that the trial court may not have conducted "the required independent review of the filings," there is no indication in the record or in the trial court's entry granting the renewed motion for summary judgment that the trial court did not conduct a thorough and independent review before granting the motion.

{¶44} For these reasons, Chris's second assignment of error is overruled.

**ASSIGNMENT OF ERROR III**

**THE TRIAL COURT ERRED IN DENYING [CHRIS'S] MOTION TO SUPPLEMENT THE RECORD TO INCLUDE DRAFT "ENTRIES" [BILL AND THE ESTATE] ONLY E-MAILED TO THE COURT.**

{¶45} In his third assignment of error, Chris argues the trial court erred in denying his motion to supplement the record with the proposed journal entries Bill and the Estate emailed to the trial court.

{¶46} This Court reviews the decision of the trial court concerning supplementation of the record for an abuse of discretion. "A trial court's grant or denial of a motion to supplement will not be overturned unless the court abuses its discretion." *Blake v. Unemp. Rev. Comm. Admr.*, 2017-Ohio-166, ¶ 23 (9th Dist.), citing *Wolk v. Paino*, 2011-Ohio-1065, ¶ 23 (8th Dist.).

{¶47} While the trial court denied Chris's motion to supplement the record with the proposed entries, the proposed entries *are* included in the record of this case as exhibits to Chris's motion. As such, even assuming error, the error would be harmless.

{¶48} Therefore, Chris's third assignment of error is overruled.

## III.

{¶49} For the forgoing reasons, Chris's assignments of error are overruled. The judgment of the Medina County Court of Common Pleas is affirmed.

Judgment affirmed.

————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
BETTY SUTTON
FOR THE COURT

FLAGG LANZINGER, P. J.
CONCURS.

CARR, J.
DISSENTING.

{¶50} I respectfully dissent from the judgment of the majority for several reasons. First, I would conclude that the trial court failed to follow this Court's remand instructions in our prior decision. "Absent extraordinary circumstances, such as an intervening decision by the Supreme Court, an inferior court has no discretion to disregard the mandate of a superior court in a prior appeal in the same case." *Nolan v. Nolan*, 11 Ohio St.3d 1 (1984), syllabus. Nothing in this Court's prior opinion suggested that we were remanding the matter for the trial court to consider an entirely new motion for summary judgment.

{¶51} Notably, when the matter was remanded, the trial court initially denied the motion for leave to file a renewed motion for summary judgment. Only after a motion for reconsideration was filed, relying in part on an entry of this Court denying a motion for reconsideration of the prior appeal, did the trial court grant the motion for leave. I would not view this Court's entry denying the motion for reconsideration as being instructive to the trial court as to how to proceed on remand. And to the extent it might be viewed that way, I do not read the entry to imply that the trial court was required to consider an entirely new motion for summary judgment.

{¶52} Even assuming that it was proper for the trial court to consider the motion for summary judgment, I dissent with respect to the majority's analysis of the merits. I would conclude that Bill and the Estate failed to meet their initial summary judgment burden. In the renewed motion for summary judgment, Bill and the Estate essentially argued that they were entitled to summary judgment solely based upon statements in the trial court's prior judgment entry. For example, Bill and the Estate claimed that Chris could not demonstrate a legitimate business purpose because "as [the trial court] already found, there is no genuine dispute that the Second Amendment was 'legitimate exercise[] of shareholder power,' as Bill and Mike were

'motivated to protect the best interests of Kenmore in avoiding a 50/50 deadlock among the remaining shareholders and potential corporate dissolution.'" In so doing, Bill and the Estate cited to a single page of the trial court's judgment entry. That page is a portion of the trial court's prior judgment entry addressing counts two and four of the complaint. In the initial appeal, this Court specifically sustained a portion of the assignment of error related to those two counts. *See Scala v. Scala*, 2023-Ohio-2232, ¶ 30, 38 (9th Dist.). It seems to be Bill's and the Estate's position that because this Court did not specifically disavow the language above, we approved of it, and it is the law of the case. This is an untenable argument, particularly in these circumstances, wherein this Court reversed that part of the trial court's decision. *See id.* Thus, given the limited argument and evidence that Bill and the Estate presented in their renewed motion for summary judgment, I would conclude that they failed to meet their initial summary judgment burden. Further, as Chris was the non-movant, he did not have a burden until Bill and the Estate met theirs. *See Bressi v. Thompson*, 2024-Ohio-2244, ¶ 14 (9th Dist.), quoting *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996).

{¶53} And while sustaining the first assignment of error would render the remaining assignments of error moot, I pause to briefly address the second and third assignments of error. The trial court's adoption of the proposed order submitted by Bill and the Estate under the circumstances in this case was improper. When the trial court agreed to consider Bill's and the Estate's renewed motion for summary judgment, it also ordered Bill and the Estate to submit a proposed entry awarding summary judgment. The trial court cited to Medina C.P., Gen.Div., Loc.R. 5(G). Loc.R. 5 addresses motions in general, not motions for summary judgment. In fact, motions for summary judgment have an entire rule dedicated to them, i.e. Loc.R. 6. Loc.R. 6 does not require the movant to file a proposed judgment entry. Accordingly, I find it concerning that

the trial court only ordered Bill and the Estate to submit a proposed judgment entry, and that it did so before it heard from the other side. It is possible members of the public could view that course of action as the trial court having already decided the matter without reviewing all the filings. This makes the trial court's nearly wholesale adoption of the proposed entry only days after the reply brief was filed even more troubling; I cannot have confidence that the trial court conducted the required independent review of the filings. *See State v. Riley*, 2024-Ohio-5712, ¶ 15.

APPEARANCES:

DAVID G. UTLEY, Attorney at Law, for Appellant.

MARION H. LITTLE, JR. and CHRISTOPHER J. HOGAN, Attorneys at Law, for Appellant.

ORVILLE L. REED, III, Attorney at Law, for Appellant.

DAVID P. BERTSCH, Attorney at Law, for Appellant.

MATTHEW W. NAKON, RACHELLE KUZNICKI ZIDER, and MICHAEL R. NAKON, Attorneys at Law, for Appellees.

BENJAMIN M. FLOWERS, Attorney at Law, for Appellees.